UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUE PLUCK, et al., | ) | CASE NO.  5:08cv1545 |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| BP OIL PIPELINE CO., | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | [Resolving Docs. 40, 41, 42] |
| | ) | |
| | ) | |

This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc.

40) and its two motions to exclude the testimony of Plaintiffs' experts (Docs. 41, 42).  Having

been fully advised and for the reasons stated herein, all three motions are GRANTED, and this

matter is DISMISSED in its entirety.

I.      Background

This matter arises out of contamination allegedly caused by a gas pipeline release near

Weaver Woodlands allotment in Franklin Township, Summit County, Ohio.[1]  Following reports

---

[1] Although none of the prior proceedings related to this matter affect the case currently, the Court will outline that procedural history for the sake of clarity.  Plaintiffs first filed these claims in the Summit County Court of Common Pleas, from which they were removed by Defendant on June 12, 2006 (Case No. 5:06cv1444).   On June 27, 2007, after limited discovery, the parties stipulated to the dismissal of the claims without prejudice under Fed. R. Civ. P. 41(a).  Plaintiffs filed a new action in the Summit County Court of Common Pleas on June 24, 2008, which Defendant removed to federal court (Case No. 5:08cv1707).  Plaintiffs then filed a nearly identical complaint before

in 1990 of drinking water contamination in Weaver Woodlands, British Petroleum ("Defendant")

entered into a voluntary agreement with the Ohio Environmental Protection Agency ("OEPA")

to investigate the source and extent of the contamination.  The OEPA testing revealed that the

wells of nine residents contained benzene concentrations that exceeded the OEPA's safe drinking

water standards.  Benzene is a colorless, aromatic liquid used in the manufacture of a variety of

products, including gasoline, solvents, and detergents.  Defendant attempted to remedy the

situation, and it conducted ongoing soil and water testing.

In May 1996, Sue and Ray Pluck (together "Plaintiffs") purchased a home at 605

Fairwood in Weaver Woodlands.  Plaintiffs used their well water to drink, wash, bathe, and

irrigate their lawn and garden.  Defendant designated Plaintiffs' property as an "area of concern"

and monitored the soil and water.  Benzene was first detected in the well at 605 Fairwood

approximately five months after Plaintiffs purchased the property.[2]  Around the same time,

Plaintiffs detected the odor of gasoline in their water, at which point Sue Pluck ("Mrs. Pluck")

began drinking bottled water in lieu of drinking from her well.  Defendant installed a new well in

December 1996 and proceeded to test the well on a quarterly basis.  According to Defendant, the

new well was tested a total of twenty-two times, with no detectable levels of benzene found.  In

October 2003, benzene was again detected in the well, after which Defendant installed a carbon-

filtration system to capture contaminants such as benzene.  In 2005, Plaintiffs' moved from 605

Fairwood on the advice of Mrs. Pluck's physician.

---

this Court, which is the instant action, on June 26, 2008.   Plaintiffs contended that they had filed the separate
actions in order to be sure all of their claims were preserved.  The Court granted a motion to consolidate Case No.
5:08cv1707 with the instant action and ordered Plaintiffs to file an amended, consolidated complaint, which they did
on October 31, 2008.  (*See* Doc. 21).  This Amended Complaint is the pleading currently before the Court on which
Defendant seeks summary judgment.

[2] On October 27, 1996, benzene was detected in the amount of 3.6 parts per billion ("ppb").  The EPA's maximum
contamination level for benzene in a community water system is 5 ppb.  40 C.F.R. § 141.61(a)(2).

In 2002, Plaintiff was diagnosed with Non-Hodgkins lymphoma ("NHL"), at the age of forty-eight.[3]  Plaintiff underwent chemotherapy in October 2002 and her cancer went into remission for five years.  She had a recurrence in 2007, but was again in remission as of January 2009.

In their Amended Complaint, Plaintiffs assert claims for negligence and strict liability for hazardous activity, as well as a loss of consortium claim on behalf of Mr. Pluck alone.  They allege that Mrs. Pluck's NHL was caused by exposure to benzene that had migrated from a gas pipeline release to their property, and that Defendant should be held strictly liable for operating the gas pipeline, an activity Plaintiffs term "hazardous."  (Doc. 21).  Defendant denies these allegations.  The Court will first address the motions regarding Plaintiffs' experts, and will then consider the Motion for Summary Judgment.

## II.     *Daubert* motions

### A.      Standard of review

Defendant seeks to exclude the testimony of Plaintiffs' experts, Drs. Landolph and Dahlgren, on the grounds that their proffered testimony does not meet the scientific evidence standards set forth in *Daubert v. Merrell Dow Pharms, Inc.,* 509 U.S. 579 (1993).  In *Daubert*, the Supreme Court held that the Federal Rules of Evidence, in particular Fed.R.Evid. 702, governs the admission of scientific expert witness testimony.[4]  *Id.* at 588.  *Daubert* requires the

---

[3] Specifically, Plaintiff was diagnosed with chronic lymphocytic leukemia (CCL) and small lymphocytic lymphoma (SLL), which are different manifestations of NHL.  A lymphoma is a proliferation of lymphocytes at a tissue site, whereas a leukemia is a proliferation of white blood cells such that they damage or destroy the architecture of the bone marrow.

[4] Fed.R.Evid. 702 provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

courts to act as gatekeepers to "ensure that all scientific testimony admitted is not only relevant, but reliable."  *Id*. at 589.

Rule 702 requires that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  To be admissible, an expert's testimony must be both "ground[ed] in the methods and procedures of science" and "more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  To qualify as scientific knowledge, "an inference or assertion must be derived by the scientific method."  *Id*.  The Court must assess the underlying reasoning or methodology employed by the expert to determine both whether it is scientifically reliable and whether it can be applied to the facts at issue.  *Id*. at 592-93.  Accordingly, the Court is not specifically concerned with the substance of the experts' conclusions; the focus is on how the experts arrived at their conclusions.

The *Daubert* Court identified several factors that may be relevant in making this reliability determination.  These include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and whether it is governed by standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community.[5]  *Id*. at 593-94.  Courts may also consider other potentially relevant factors, including whether experts are proposing to testify about matters pertaining to research they have conducted independent of litigation or whether an expert developed his opinions for the purposes of testifying. *Adams v. Cooper Indus., Inc.*, No. 03-476-JBC, 2007 WL 2219212, at *6 (E.D. Ky. July 30, 2007); *see also In re: Meridia Prods. Liab. Litig.*, 328 F.Supp.2d 791, 806 (N.D.Ohio 2004), *aff'd*, 447 F.3d 861 (6th Cir. 2006) (holding that opinions based upon

---

[5] The Daubert inquiry is flexible, and the above factors are neither exhaustive nor definitive, and may or may not all be pertinent in a given case. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999).

subjective judgments are liable to exclusion as unreliable). Additionally, the Court may need to determine whether the expert has unjustifiably extrapolated from an accepted principle to an unsupported conclusion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases the trial court "may conclude that there is simply too great an analytic gap between the data and the opinion proffered"). Ultimately, whatever factors are considered, the court's gate-keeping objective "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In toxic tort cases the issue of causation is two-pronged: the plaintiff must establish both that (1) the toxic substance is capable of causing the condition at issue (general causation) and (2) the toxic substance in fact caused the plaintiff's condition (specific causation). *In re Meridia*, 328 F.Supp.2d at 798; *See also Terry v. Caputo*, 875 N.E.2d 72, 76-77 (Ohio 2007) (adopting the two-prong causation analysis in Ohio state courts). In this case, both experts proffered opinions on both general and specific causation. The Court will limit its discussion of causation to the specific causation testimony.[6]

"Specific causation is defined simply as 'whether exposure to an agent was responsible for a given individual's disease.'" *Adams*, 2007 WL 2219212 at *3 (citing Federal Judicial Center, *Reference Manual on Scientific Evidence* 396 (2d ed. 2000)). The specific causation inquiry begins with a showing of exposure to a toxic substance at a level "sufficient to induce the complained-of medical condition (commonly called a 'dose-response relationship')." *Valentine*

---

[6] For purposes of this analysis only, the Court will assume that Plaintiffs' scientific expert testimony establishes general causation.

*v. PPG Indus., Inc.*, 821 N.E.2d 580, 588 n.1 (Ohio Ct. App. 2004), *aff'd*, 850 N.E.2d 683 (Ohio 2006).  A specific causation opinion should be based on:

> an assessment of the individual's exposure, including the amount, the temporal relationship between the exposure and disease, and other disease-causing factors. This information is then compared with scientific data on the relationship between exposure and disease.  The certainty of the expert's opinion depends on the strength of the research data demonstrating a relationship between exposure and the disease at the dose in question and the absence of other disease-causing factors.

*Reference Manual on Scientific Evidence*, 422-23.

### 1.      Dr. Dahlgren's specific causation opinion

Rule 702 requires that an expert be qualified based on knowledge, skill, and experience, among other factors.  Defendant contends that Dr. Dahlgren is unqualified to offer expert testimony as to causation because he is not an oncologist and does not treat cancer patients, but instead spends the vast majority of his time engaged in litigation support activities.  The causation issue here is whether alleged benzene exposure caused Plaintiff's NHL.

Dr. Dahlgren's lack of experience in treating cancer is not necessarily relevant to the issue of identifying cancer in this matter and determining possible causes.  In his expert report, Dr. Dahlgren states that he is a medical doctor with board certification in internal medicine and over thirty years' experience in occupational and environmental toxicology.  Based on his internal medicine board certification and toxicology experience, he appears to have the *capacity* to proffer a reliable causation determination.  However, even a qualified expert is capable of rendering scientifically unreliable testimony; therefore it is imperative for the trial court to examine the underlying principles and methodology of the expert's opinion.  In applying the *Daubert* standard to Dr. Dahlgren's testimony, the Court is concerned regarding both the scope of his methodology and the basis for his conclusions as they pertain to specific causation.

6

Defendant argues that Dr. Dahlgren's testimony is unreliable because he formulated a specific causation opinion without evidence of dose, and subsequently performed an unreliable dose reconstruction in an attempt to support his opinion. In arguing for the exclusion of Dr. Dahlgren's testimony, Defendant relies heavily on the decisions in *Nelson v. Tennessee Gas Pipeline Co.*, No. 95-1112, 1998 WL 1297690 (W.D.Tenn. Aug. 31, 1998), *aff'd*, 243 F.3d 244 (6th Cir. 2001) and *Adams*, 2007 WL 2219212. In *Nelson*, the plaintiffs alleged that a natural gas pipeline near their homes caused them injury by releasing toxic substances into the atmosphere, soil, and water. *Nelson*, 1998 WL 1297690 at *1. The Sixth Circuit affirmed the district court's exclusion of the plaintiff's specific causation expert when, among other things, the expert made no attempt to determine the dosage of the toxin to which the plaintiffs were exposed.[7] *Nelson*, 243 F.3d at 252. As the trial court in *Nelson* observed, "An appropriate methodology requires evidence from which the trier of fact could conclude that the plaintiff was exposed to levels of toxin sufficient to cause the harm complained of." *Nelson*, 1998 WL 1297690 at *6.

Similarly, in *Adams*, the court excluded the plaintiffs' specific causation experts in a water contaminant case where the "experts focused on whether the defendants' chemicals could have reached the plaintiffs, [but] they made no inquiry into the *amounts* of the chemicals to which the plaintiffs were exposed."[8] *Adams*, 2007 WL 2219212 at *5. Further, the experts reviewed the data and evidence they claimed supported their opinion only after reaching their specific causation opinion, a methodology rejected by that court as "lacking the objectivity that

---

[7] The court also relied on other *Daubert* factors in excluding the expert, including: his failure to rule out potential alternative causes, failure to consider the temporal relationship between the plaintiffs' conditions and their exposure, failure to use a generally accepted causation theory, and use of a study that was performed for litigation purposes. *Nelson*, 1998 WL 1297690 at *5-9.

[8] In *Adams*, the experts considered (1) industrial activities that occurred at the defendant's nearby plant; (2) air dispersion models, showing that the toxic chemicals traveled to areas in which the plaintiffs lived; (3) soil sampling covering the area where the plaintiffs lived; (4) groundwater testing in the area; (5) the plaintiffs' medical histories and depositions. *Adams*, 2007 WL 2219212, at *5.

is the hallmark of the scientific method."  *Id*. at \*6.  ("An expert may not come to a firm conclusion first and then collect the data to substantiate that conclusion.").

In his expert report, Dahlgren states that he is of the opinion that Mrs. Pluck's NHL was caused by an "injurious exposure to benzene and other organic solvents" originating at the "BP Refinery." (Dahlgren Exp. Rpt. at 20).[9]  Specifically, he assumed that benzene exclusively from Defendant's gas pipeline caused Plaintiff's cancer.  *Id*.  Dahlgren formulated this specific causation opinion without any exposure data, only having been told that Plaintiff had been "heavily" exposed to benzene in her water.  In fact, he specifically noted that "[t]he dose from this exposure needs to [be] quantified," which means that, at the time Dahlgren formulated his opinion for purposes of preparing his report, he had no calculation for Mrs. Pluck's dose exposure. *Id.*

Dahlgren began his report by summarizing Mrs. Pluck's medical history and later stated that benzene is "one of the *few* substances" that have been identified by the U.S. Environmental Protection Agency (EPA) as a "Group 1" known human carcinogen.  *Id*. at 11-12.  According to Dahlgren, because benzene is a known carcinogen, application of quantitative risk estimates is appropriate, and "it is presumed that there is NO level of exposure to a carcinogen that does not pose a certain level of risk."[10]  *Id*. at 12.

Working with only Plaintiff's medical records and a suggestion that Plaintiff was exposed to benzene through a leak in Defendant's gas pipeline, Dahlgren concluded that (1) "chronic low-level exposures" to benzene causes NHL, (2) Mrs. Pluck "probably had an injurious

---

[9] Dahlgren's Expert Report may be found at Doc. 41-2.

[10] "Risk estimates are the probability of an individual developing cancer as a risk of exposure to [a] contaminant." Dahlgren Exp. Rpt. at 12.  Dahlgren states that the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry has set the "Minimum Risk Level" (MRL) for chronic (> 365 days) benzene inhalation at 0.003 ppm (3 ppb).  *Id.*  He claims that this MRL is based on "neurological endpoint and not cancer," subsequently noting that the risk level for cancer is substantially higher:  "There is no safe level of benzene in terms of causing cancer."  *Id*.

exposure to benzene," and (3) the "dose from the exposure needs to [be] quantified." *Id*. at 20. In light of the limited information available to him, Dahlgren opined that "it is [his] opinion to a reasonable degree of medical certainty that Sue Pluck's non-Hodgkin's lymphoma was caused or contributed to be caused by benzene from the BP refinery." *Id*. Dahlgren presumably relied on his "quantitative risk estimate analysis"—that "[t]here is no safe level of benzene in terms of causing cancer"—in arriving at his conclusion. *Id.* at 12.

First, the fact that a regulatory agency classifies a chemical as carcinogenic is not dispositive of the issue of causation and does not necessitate an expert's opining that that a plaintiff's cancer was caused by the particular substance. *Valentine*, 821 N.E.2d at 598; *see also Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996) ("[T]he fact that [ethylene oxide] has been classified as a carcinogen by agencies responsible for public health regulations is not probative of the question whether [the plaintiff's] brain cancer was caused by [this] exposure."). Similarly, here, the mere fact that benzene has been identified as a carcinogen and Plaintiff may have been exposed to benzene does not provide reliable scientific evidence that benzene from Defendant's pipeline caused Plaintiff's cancer.

The only analysis that would support such a conclusion would be the analysis based solely upon Dahlgren's assertion that there is no safe level of benzene exposure. However, neither Dahlgren nor Plaintiffs have presented supporting scientific evidence or cases holding that the "no safe dose" theory is reliable. To the contrary, courts have opined that this principle is not an appropriate basis to establish a specific causation opinion. See *Adams*, 2007 WL 2219121 at *7 (citing numerous cases rejecting risk assessment for the purposes of establishing specific causation in an individual). Further, benzene is ubiquitous in the environment; therefore, if *any* exposure is sufficient to cause cancer, it would be virtually impossible to

9

identify Defendant's gas leak as the source of benzene that caused Mrs. Pluck's cancer.  It is apparent upon review of the record that Plaintiff was also chronically exposed to benzene as a heavy cigarette smoker, calling into question how Dahlgren could attribute Mrs. Pluck's NHL to Defendant alone under his "no safe dose" theory.[11]  As did the court in *Adams*, this Court finds that the "no safe dose" theory is not a reliable methodology and should be excluded from Dr. Dahlgren's opinion regarding specific causation.

The fact that Dr. Dahlgren formed a specific causation opinion without any evidence on dose further calls into question the validity of his opinion and whether it is based upon an objective scientific methodology as required under *Daubert* and Rule 702.  Since the submission of his expert report, Dr. Dahlgren has attempted to supplement his opinion by supposedly conducting a dose reconstruction and differential diagnosis analysis.  At his deposition, Dahlgren claimed to have performed a dose reconstruction.  Unfortunately, he could not explain how he performed his purported dose reconstruction nor furnish any specific results.  Citing odor threshold and gasoline composition studies to estimate an amount of benzene present in the air when Mr. Pluck noticed a faint smell of gasoline, Dahlgren opined:

> Using those figures, [Mrs. Pluck] was exposed to a concentration of benzene that would be, from all routes of exposure, from taking a shower, to drinking the water, to living in the home where the supplied water contained benzene and gasoline for six months, that six-month period would give her an increased risk, one shower a day, 129 times higher than the Patel study would indicate increases the risk of exposure and an increased risk of leukemia fourfold.[12]

---

[11]  Mrs. Pluck testified to having a thirty year history of smoking and continues to smoke one pack per day.  (*See* Sue Pluck Dep. at 28.)

[12]  Dahlgren based his purported dose reconstruction on Plaintiffs' testimony that they noticed a smell of gasoline at their kitchen faucet and basement for a short period in 1996.  (*See* Sue Pluck Dep. (Doc. 39-1) at 95-96; Ray Pluck Dep. (Doc. 39-2) at 12-15.)  Mrs. Pluck indicated that she stopped drinking the well water as soon as the smell of gasoline was detected in it.  (Sue Pluck Dep. at 90-92.)

Dahlgren Dep. at 31.[13]  When asked to explain his calculations and notes on dose reconstruction, Dahlgren could not, stating, "I'm not sure about any of these scribbles."  *Id.* at 153.

Defendant alleges that Dahlgren's dose reconstruction is unreliable, amounting to nothing more than some indecipherable "scribbles."  Given Dahlgren's vague testimony, there is simply no way for this Court to analyze his dose reconstruction under the reliability factors set forth in *Daubert*.  Dahlgren provided no evidence that he incorporated any accurate case-specific data into his dose calculation.  Instead, it would appear that he calculated a six-month dose based on gasoline odor and composition studies from decades ago.  Nowhere in the record did Plaintiffs claim that the alleged odor of gasoline from their faucet persisted for anywhere near six months.  Further, as noted by Defendant, the Patel article that Dahlgren cites to establish a frame of reference for his calculation did not find a statistically significant association between NHL and residing near a gasoline spill.  In fact, that aspect of the study was neither cited nor discussed in his expert report.

Plaintiffs respond that Dahlgren's purported dose reconstruction is "foundational" in nature, and only serves to reinforce his opinion.  In support of this position, Plaintiffs argue that there is no Sixth Circuit requirement that a specific causation expert perform a dose reconstruction, citing *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171 (6th Cir. 2009) and *Hardyman v. Norfolk & Western RR Co.*, 243 F.3d 255 (6th Cir. 2001).  In both cases, the plaintiffs' experts relied on differential diagnosis as a valid scientific methodology to arrive at a specific causation conclusion.  Both *Best* and *Hardyman*, however, are distinguishable from the case at bar because, in this case, Dahlgren did not employ a differential diagnosis methodology to reach his specific causation opinion.  It is glaringly apparent from the record that he did not

---

[13] Dahlgren's Deposition may be found at Doc. 46.

attempt to utilize a differential diagnosis methodology until after discovery had closed and Defendant had filed its *Daubert* motions and motion for summary judgment.

Plaintiffs further opine that Defendant had ample opportunity to examine Dahlgren on his dose reconstruction during his deposition and that Defendant's critique of the methodology should be addressed at trial.  However, Defendant was unable to examine Dahlgren fully on his purported dose reconstruction because, at his deposition, Dahlgren was unable to articulate how he arrived at his conclusion.  To the extent that they did examine Dahlgren, his responses were confused, contradictory, and muddled.  His "scribbles" do not represent a scientifically reliable methodology that can be objectively tested, would be "generally accepted," and would withstand peer review.  As the Supreme Court stated in *General Electric*, "nothing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec.*, 522 U.S. at 146.

Finally, Plaintiffs assert that this Court should consider Dr. Dahlgren's "supplemental" dose reconstruction testimony filed as a Declaration/Affidavit ("Declaration")[14] after the close of discovery and after Defendant submitted motions.  In so arguing, Plaintiffs cite *GED Integrated Solutions, Inc. v. Durotech Int'l, Inc.,* No. 5:06CV1327, 2009 WL 233872 (N.D. Ohio Jan. 30, 2009), in which this Court allowed a supplemental report that provided a detailed definition of the methodology, the expert's qualifications for performing it, and the underlying data used to perform the test.[15]  Here, unlike *Durotech*, Dahlgren's Declaration provides no additional information that would assist this Court in making a reliability determination based upon testimony or opinions previously offered.  Instead, the Declaration merely contradicts his previous testimony.

---

[14] Dahlgren's Declaration may be found at Doc. 51.

[15] *Durotech* was a patent infringement case in which the expert had performed a finite element analysis, modeled by a software program.

In his Declaration, Dahlgren relies heavily on a differential diagnosis methodology to reach his conclusion.  Differential diagnosis describes the process of isolating the cause of a patient's symptoms through the systematic elimination of all potential causes.  *See Hardyman*, 243 F.3d at 260 (internal quotation omitted).  In short, it is a process of elimination, whereby an expert "rules in" all relevant potential causes or risk factors, and subsequently "rules out" alternative causes or risk factors.  *Id*.

Dahlgren opines in the Declaration that "[t]he dose reconstruction yielded a dose . . . of 1.7 parts-per-million years," which is "57 times more than the dose required to increase the risk of leukemia four-fold."  During his deposition, however, Dahlgren stated that Mrs. Pluck's calculated dose was "129 times higher" than the dose required to increase the risk of leukemia four-fold, based on the same Patel study.  *Compare* Dahlgren Dep. at 31, Dahlgren Decl. ¶ 18.  Such inconsistencies fly in the face of scientific objectivity and reliability and simply do not meet the requirements of Rule 702.

Although the Court agrees with Plaintiffs that differential diagnosis can be a reliable scientific methodology to establish specific causation, nowhere is such methodology discussed in either Dahlgren's expert report or his deposition.  It is not discussed until the Declaration.  This Court's Case Management Plan (Doc. 13) established a deadline of December 15, 2008, for expert reports, cautioning that "an expert will not be permitted to testify or provide opinions on issues not raised in his/her report."  Dahlgren's late-filed Declaration contains an entirely new methodology—differential diagnosis—which he purportedly relied upon to reach his specific causation opinion.  (Doc. 51).

"District courts have broad discretion to exclude untimely disclosed expert-witness testimony." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)(citing *Trilogy Commc'ns v.*

13

*Times Fiber Commc'ns*, 109 F.3d 739, 745 (Fed. Cir. 1997) (upholding the exclusion of untimely

expert supplemental reports and affidavit submitted in violation of the court's scheduling order).

In *Pride*, the court rejected the plaintiff's motions for leave to modify the scheduling order as a

"transparent attempt to reopen" the *Daubert* inquiry after "the weaknesses in [the] expert

testimony have been pointed out."  *Pride*, 218 F.3d at 579 (observing that Plaintiff had "ample

opportunity to locate experts for this case, and her experts had ample opportunity to develop their

theories on how the accident occurred, to explain their underlying methodology, and test their

theories prior to the Daubert hearing").  Moreover, "it is implausible to suggest, post-*Daubert*,

that parties will initially present less than their best expert evidence in the expectation of a

second chance should their first try fail."  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

Here, Plaintiff has submitted new expert testimony months after the expert testimony

deadline, and after Defendant has filed motions to exclude the expert testimony and a motion for

summary judgment.  After a thorough review of the record, it is clear that Dahlgren's declaration

disclosed an entirely new differential diagnosis methodology that was not mentioned at any point

prior to the submission of his declaration.  Plaintiffs' attempt to analogize to this Court's

decision *GED*, 2009 WL 233872, is misplaced:  the Court gave the expert in *GED* an opportunity

to offer further explanation of a methodology he had clearly employed in reaching his opinion

and preparing his report, and to which he had testified at his deposition.  Dahlgren, on the other

hand, is attempting to introduce an entirely new methodology well after the point at which it

would be proper.  At this point in the litigation, it is inherently unfair to allow Plaintiff what is

essentially a third chance at providing a scientifically reliable specific causation opinion.

Even assuming *arguendo* that the Court could consider Dahlgren's differential diagnosis,

it is unpersuasive and contradictory of his prior testimony.  He originally testified that there is no

safe dose of benzene in terms of causing cancer.  Therefore, differential diagnosis cannot be employed to determine the source of Mrs. Pluck's toxic benzene exposure because Mrs. Pluck was unequivocally exposed to benzene for over thirty years.  Not only was she a heavy cigarette smoker, but she would have had exposure—as all people do—to ubiquitous benzene in the air. Dahlgren's positions are entirely incompatible.  For this reason and because of its untimeliness, the Declaration is hereby stricken from the record.

Upon review of the entire record in this case, the Court finds that Dahlgren's testimony suffers significant methodological flaws and is apparently based upon speculation and conjecture rather than evidence and data.  Other courts have discussed Dahlgren's methodology and expert testimony and have found them lacking for reasons similar to those stated herein.[16]

Although Plaintiffs argue that the Court should permit a jury to determine the weight to be accorded to Dahlgren's testimony, this Court disagrees.  In *Daubert*, the Supreme Court unequivocally held that Rule 702 set a threshold of scientific validity that expert testimony must meet to be admissible.  Dahlgren's proffered testimony is grounded on methodology that is not scientifically valid, will not assist the trier of fact, and is likely to mislead a jury.  This Court, being mindful of its "gatekeeping" role, hereby excludes Dahlgren's specific causation opinion.

### 2.    Dr. Landolph's specific causation opinion

As set forth above, a plaintiff raising a negligence claim regarding toxic substances must demonstrate *both* general causation (that the toxic substance at issue is capable of causing the plaintiff's illness) and specific causation (that the specific plaintiff's illness was in fact caused by

---

[16] *See e.g.*, *Babin v. Ecolab, Inc.*, No. 2:04-CV-1595, 2005 WL 1629947 at *3 (W.D. La. July 5, 2005) (holding that there was "simply too great an analytical gap between the opinion offered by Dr. Dahlgren and the data he proffered to support his opinions" (internal quotation marks omitted)(quoting *General Elec.*, 522 U.S. at 146)); *Abraham v. Union Pacific R. Co.*, 233 S.W.3d 13, 22-24 (Ct. App. Tex. 2007) (holding that Dahlgren made "indefinite measurements of exposure" that were "subject to wide variance and largely open to speculation" and connected to the appellants' injuries only by his "unsupported assertion").

the toxic substance). *See Terry*, 875 N.E.2d at 77. Dr. Landolph is a toxicologist who described himself as an expert in general causation. However, he employed no discernable scientific methodology to support his assertion of specific causation, choosing instead to rely upon the purported methods and findings of Dahlgren, Plaintiffs' specific causation expert. In his expert report, Landolph concurs with Dahlgren's opinion that Plaintiff's NHL was caused by her exposure to benzene from Defendant's pipeline. (Landolph Exp. Rpt. at 18.)[17] He further testified that he would "defer to a physician," Dahlgren in this case, to make a final determination of specific causation. (Landolph Dep. at 40.)[18]

Plaintiffs assert that Landolph can rely on Dahlgren's dose reconstruction to form a specific causation opinion. There are two problems with this assertion. First, it is clear that Landolph formulated and asserted his specific causation opinion long before Dahlgren's purported attempt at dose reconstruction, on which Dahlgren attempted to base his specific causation opinion.[19] Second, even if the timeline were different, Dahlgren's testimony is scientifically unreliable and therefore inadmissible under *Daubert* for the reasons set forth above. Landolph's bare conclusion regarding specific causation, which is based solely on the unsupported opinion of another expert, does not employ the requisite reliable scientific methodology. Accordingly, the Court must exclude Landolph's opinion on specific causation.

### 3.    Conclusion regarding expert testimony

For the reason set forth above, the Court GRANTS both of Defendant's motions to exclude expert opinions, and hereby excludes the specific causation opinion of both of Plaintiffs'

---

[17] Landolph's Expert Report may be found at Doc. 42-11.
[18]  Landolph's Deposition may be found at Doc. 49.
[19]  Landolph submitted his expert report on October 4, 2007. Dahlgren purportedly conducted his dose reconstruction on February 11, 2009, the night before his deposition. (Dahlgren Dep. at 152.)

experts.  Further, Dahlgren's affidavit setting forth his opinion regarding differential diagnosis is hereby STRICKEN from the record.

**III.  Motion for Summary Judgment**

### A.  Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party.  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

Summary judgment is appropriate if the party that bears the burden of proof at trial does not establish an essential element of its case.  *Tolton v. Am. Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Id.* at 248.  Summary judgment should be denied if, based upon the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

**B.** **Legal analysis**

Defendant contends that the exclusion of expert testimony must result in the granting of summary judgment on Plaintiffs' negligence claims, and, further, that Plaintiffs have failed to plead that Defendant's activities were ultra-hazardous, which precludes Plaintiffs' argument for strict liability.  The Court will consider each claim independently.

**1.** **Negligence and Loss of Consortium**

As the Court indicated above, the Supreme Court of Ohio has adopted the following analysis for negligence claims in toxic tort cases:

> To present a prima facie case involving an injury caused by exposure to mold or other toxic substance, a claimant must establish (1) that the toxin is capable of causing the medical condition or ailment (general causation), and (2) that the toxic substance in fact caused the claimant's medical condition (specific causation).

*Terry*, 875 N.E.2d at 77.  In *Terry*, the Court affirmed the decision of the appellate court finding that, while the plaintiffs had provided sufficient expert testimony on the issue of general causation, the expert testimony provided on the issue of specific causation was invalid and should be excluded.  *Id.* at 79.  "Without expert testimony to establish both general causation and specific causation, a claimant cannot establish a prima facie case of exposure to mold or other toxic substance."  *Id*.

In this case, the Court has not passed judgment on the issue of general causation.  Instead, it has found that the testimony on specific causation is insufficient.  Without sufficient valid specific causation testimony from either of Plaintiffs' experts, Plaintiffs have failed to set forth a prima facie case for negligence and the Court GRANTS Defendant's Motion for Summary Judgment on the negligence claim.

## 2.    Strict Liability

Defendant argues that Plaintiffs, in the strict liability count of their Amended Complaint, failed to plead that the maintenance of a gas pipeline constitutes an ultrahazardous activity. Instead, Plaintiffs have alleged that it was simply a hazardous activity, which Defendant contends would not be subject to strict liability as a matter of law. It is for this reason that Defendant believes it should prevail on summary judgment.

The Court reserves judgment on the issue of whether it was sufficient for Plaintiffs to plead that Defendant's actions were "hazardous" rather than "ultra-hazardous." Instead, it finds that Plaintiffs have failed to set forth sufficient evidence of causation to support their claim for strict liability, just as the evidence of causation was insufficient to demonstrate negligence. A plaintiff alleging a claim for strict liability as a result of damage incurred because of a defendant's ultra-hazardous activity must establish a prima facie case by, among other things, putting forth sufficient evidence that his injury was proximately caused by the defendant's actions. *See Banford v. Aldrich Chem. Co.*, 904 N.E.2d 582, 591 (Ohio Ct. App. 2008) (citing *Temple v. Wean United, Inc.*, 364 N.E.2d 267, 270 (Ohio 1977)). Plaintiffs have failed to do so in this case. For this reason, Defendant's motion for summary judgment on Plaintiffs' claim for strict liability is GRANTED.

## 3.    Loss of consortium

Under Ohio law, a loss of consortium claim is a derivative claim. Because the primary claims raised by Plaintiffs must fail for lack of evidence of causation, Mr. Pluck's loss of consortium claim must also fail. *See, e.g., Manno v. St. Felicitas Elementary Sch.*, 831 N.E.2d 1071, 1078 (Ohio Ct. App. 2005).

**C.**     **Conclusion regarding motion for summary judgment**

As Plaintiffs have failed to support either the claim for negligence or the claim for strict liability with evidence of specific causation, summary judgment is GRANTED on both claims, as well as on Mr. Pluck's claim for loss of consortium.

**IV.     Conclusion**

For the foregoing reasons, Defendant's motions to exclude expert testimony (Docs. 41, 42) are GRANTED on the basis that neither expert has provided valid or sufficient testimony on the issue of specific causation.  The affidavit of Dr. Dahlgren in support of his deposition testimony (Doc. 51), filed after Defendant's motions to exclude expert testimony and for summary judgment were filed, is hereby STRICKEN from the record.  Defendant's Motion for Summary Judgment (Doc. 40) is hereby GRANTED.

IT IS SO ORDERED.

DATED:  November 25, 2009          */s/ John R. Adams*_____
                                                          Judge John R. Adams
                                                          UNITED STATES DISTRICT COURT